Akshay S. Deoras (SBN 301962)
Yan-Xin Li (SBN 332329)
Jenny Quang (SBN 345742)
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
T: (415) 439-1400
F: (415) 439-1500
akshay.deoras@kirkland.com
yanxin.li@kirkland.com
jenny.quang@kirkland.com

Victoria Petty (SBN 338689)
Jordan Wells (SBN 326491)
LAWYERS' COMMITTEE FOR CIVIL
    RIGHTS OF THE SAN FRANCISCO BAY
    AREA
131 Steuart Street, Suite 400
San Francisco, CA 94105
T: (415) 543-9444
F: (415) 543-0296
vpetty@lccrsf.org
jwells@lccrsf.org

*Attorneys for Plaintiffs J.C.O.C. and M.M.O.S.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.C.O.C. on his behalf and on behalf of his minor child, M.M.O.S.,<br><br>        Plaintiffs,<br><br>      v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | Case No.: 3:23-cv-5268<br><br>**COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT** |

I.       INTRODUCTION

1.       This action seeks justice for a father and daughter who fled violence in Honduras to seek safety in the United States, only to meet cruelty at the hands of the federal government.  In 2018, the United States adopted a policy ("Family Separation Policy" or "Policy") of ***intentionally*** separating migrant families for the express purpose of inflicting emotional harm upon such families to deter them from migrating to the United States.  Plaintiffs J.C.O.C. and M.M.O.S. became victims of this abhorrent policy when government officials shackled J.C.O.C., hand and foot, and lured him away from his then nine-year-old daughter M.M.O.S. to an undisclosed location.  J.C.O.C. and M.M.O.S. never had a chance to say goodbye and would be separated for two months.

2.       Upon separation from his minor daughter, J.C.O.C. felt physical pain akin to torture. Compounding the extreme emotional stress of government's forcible separation of M.M.O.S. from J.C.O.C., government officials deprived J.C.O.C. of his prescription medication after he crossed the border, forcing him to endure the trauma of separation with an untreated anxiety disorder.  For over a month, government officials refused to provide J.C.O.C. with any information about his daughter's whereabouts or wellbeing.  Not knowing where his daughter was, whether she was safe, or if he would ever even see her again, J.C.O.C. suffered constant anxiety that manifested into physical symptoms.

3.       The trauma suffered by J.C.O.C. and by M.M.O.S. was the very aim of the Family Separation Policy.  The government officials who created and directed the implementation of the Policy sought to "deter" migrants, believing that if arriving asylum-seekers were subject to such inhumane treatment—*i.e.*, the severe emotional distress of having their children taken from them— they would "give up" on their asylum applications and agree to be deported from the United States. These government officials articulated this vision when they created the Family Separation Policy, even though the right to apply for asylum protected by statute[1] as well as international law.  The officials also sought to generate media coverage of the Policy and its effects, including the emotional

---

[1] 8 U.S. Code § 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum").

pain inflicted by family separation, believing that international media coverage of the Policy would deter future potential migrants from coming to the United States.

4.     Thanks to public outrage and court intervention, the Family Separation Policy is no longer in effect.  But Plaintiffs' lives, along with the lives of thousands of other migrant families, were changed forever.  Senior government officials have since pledged to bring justice to affected families, publicly acknowledging that the family separations committed under the Policy constituted torture.[2]  Yet, officials have failed to rectify these wrongs, and instead have chosen to encumber the Policy's victims with the heavy burden of litigating their claims in court, including filing motions to dismiss and motions to transfer venue that have been repeatedly denied on the merits in earlier suits in this and other district courts as a tactic to delay resolution of these victims' claims.  This is despite President Biden's condemnation of the Family Separation Policy as a "human tragedy" that "violates every notion of who we are as a nation."[3]  Plaintiffs accordingly bring this action to seek redress for the harms they have suffered under the Family Separation Policy.

## II.     JURISDICTION

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1346(b)(1).

6.     Plaintiffs bring this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq*.  The FTCA has an administrative exhaustion requirement under which a claimant, before filing suit, must tender an administrative claim to the federal government.  If the relevant agency does not finally dispose of the administrative claim within six months, then the claimant is deemed to have exhausted administrative remedies.  28 U.S.C. § 2675(a).  All Plaintiffs filed administrative claims with the relevant federal agencies on May 23, 2020, well over six months

---

[2] Ex. 1, *Part of My Heart Was Torn Away: What the U.S. Government Owes the Tortured Survivors of Family Separation*, PHYSICIANS FOR HUMAN RIGHTS, Apr. 2022, at 2, https://phr.org/wp-content/uploads/2022/04/PHR_-Report_Deported-Parents_2022.pdf.
[3] Ex. 2, *Executive Order on the Establishment of Interagency Task Force on the Reunification of Families*, WHITE HOUSE BRIEFING ROOM (Feb. 2, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/02/executive-order-the-establishment-of-interagency-task-force-on-the-reunification-of-families/; Ex. 3, Eugene Kiely et al., *Fact Check: What Trump and Biden Got Wrong in the Final Presidential Debate*, USA TODAY (Oct. 23, 2020, updated 10:34 AM), https://www.usatoday.com/story/news/politics/elections/2020/10/23/factcheck-org-corrects-trump-biden-claims-final-debate/3740727001/.  Indeed, President Biden established an Interagency Task Force on the Reunification of Families—the functions of which include providing trauma and mental health services to separated children and families and issuance of visas or other immigration benefits.  Ex. 2.

---

ago. The agencies failed to finally dispose of Plaintiffs' administrative claims within six months after they were filed, which by statute is a constructive final denial of the claims. 28 U.S.C. § 2675(a); 28 C.F.R. §§ 41.2(c), 14.9(b).

### III. VENUE

7. Because Plaintiffs reside in this District, venue is proper under 28 U.S.C. § 1402(b).

8. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) for the additional reason that a substantial part of the events giving rise to their claims occurred within this District.

### IV. DIVISIONAL ASSIGNMENT

9. This action is properly assigned to the San Francisco and Oakland Division pursuant to Civil Local Rule 3-2(c) and General Order 44(D)(1) because this action arises in Contra Costa County and because FTCA cases are not exempt from intradistrict assignment.

### V. THE PARTIES

10. Plaintiff J.C.O.C., currently 52 years old, fled his native country of Honduras in May 2018 with his minor daughter, M.M.O.S. J.C.O.C. presently resides in Richmond, California. J.C.O.C. has been granted parole-in-place status by United States Citizenship and Immigration Services ("USCIS") and has a pending application for U Nonimmigrant status ("U Visa") before USCIS. J.C.O.C. is a confirmed member of the certified class in *Ms. L v. U.S. Immigr. & Customs Enf't*.[4]

11. Plaintiff M.M.O.S., currently fourteen years old, fled Honduras with her father J.C.O.C. in May 2018. M.M.O.S. was nine years old at the time of the forced separation described in this Complaint and was a minor at all times that Defendant's employees detained her. M.M.O.S. currently resides in Richmond, California with J.C.O.C. M.M.O.S. has been granted parole-in-place by USCIS and is a pending derivative applicant for U Nonimmigrant status, such that her U visa would derive from her father's, once approved.

12. The United States of America ("Defendant") has waived sovereign immunity for claims under the FTCA and is properly named as a defendant to each of Plaintiffs' claims under the

---

[4] Ex. 4, Order Granting in Part Plaintiffs' Motion for Class Certification at 17, *Ms. L v. U.S. Immigr. & Customs Enf't*, No. 18-428 (S.D. Cal. Jun. 26, 2018), ECF No. 82.

FTCA.  28 U.S.C. §§ 2671–2680.  Defendant acted through the Department of Homeland Security ("DHS"), the Department of Health and Human Services ("HHS"), and the Department of Justice ("DOJ")—all "federal agencies" of the United States under 28 U.S.C. § 2671—and the federal agencies' employees, officers, and agents.  These further include, and are not limited to, U.S. Customs and Border Protection ("CBP"), Immigration and Customs Enforcement ("ICE"), and USCIS, subcomponent agencies of DHS that are under the direction, authority, and control of the Secretary of Homeland Security; the Office of Refugee Resettlement ("ORR"), a subcomponent agency of HHS that is under the direction, authority, and control of the Secretary of Health and Human Services; and the Office of the Attorney General within DOJ.

13.     At all relevant times, the federal officers referenced in this Complaint were employees of the United States, working within the scope and course of their employment at the aforementioned federal agencies.

14.     DHS employees were responsible for separating J.C.O.C. and M.M.O.S. from each other.  DHS employees were also responsible for supervising and managing detained individuals at CBP and ICE facilities, including the facilities where Plaintiffs were detained.

15.     HHS employees are responsible for supervising and managing the detention of children the government classifies as "unaccompanied," including at facilities where M.M.O.S. was detained while separated from her father.

16.     High-ranking officials from DHS, HHS, and DOJ worked together to design and promulgate the unlawful and unconstitutional Family Separation Policy, under which Plaintiffs were subject to significant harm.

## VI.     FACTUAL ALLEGATIONS

### A.     GOVERNMENT OFFICIALS INFLICTED LASTING HARM ON PLAINTIFFS THROUGH INHUMANE CONDITIONS AND FORCED SEPARATION

#### 1.     *PLAINTIFFS FLEE HONDURAS AND SEEK SAFETY IN THE UNITED STATES*

17.     Plaintiffs fled Honduras to find a safer life, but upon arriving to the United States, were met with traumatizing treatment and forced separation.  J.C.O.C. lived in Honduras with his long-term partner and their four children, but made the difficult decision to flee his home country

because of threats of harm.  J.C.O.C.'s two younger children were too young to make the trip to the United States.  His eldest daughter was diagnosed with leukemia and too ill to make the journey (and died in Honduras not long after J.C.O.C. and M.M.O.S. were reunited in the United States).  J.C.O.C. could only take his then nine-year-old daughter, M.M.O.S.

18.     J.C.O.C. and M.M.O.S. fled Honduras in May 2018, embarking on a difficult journey filled with hunger and thirst.  Later that month, J.C.O.C. and M.M.O.S. crossed the border near El Paso, Texas.  They walked a short distance from a fence on the border when a U.S. Border Patrol ("Border Patrol") agent in a truck approached them.   They surrendered peacefully to the Border Patrol agent, who then arrested Plaintiffs and drove them to a CBP detention facility, which on information and belief, was the El Paso Del Norte Processing Center, located at 8915 Montana Avenue, El Paso, Texas 79925.  During the drive there, the Border Patrol agent told J.C.O.C. that he would be deported.

19.     When Border Patrol agents detained J.C.O.C. and M.M.O.S., they were dehydrated and hungry.  Despite their intense journey, Border Patrol agents did not ask about their health or wellbeing during their time in CBP custody.  No one identified themselves to J.C.O.C. or M.M.O.S. as a medical professional or health worker.  Although Defendant's cruelty started at the border, it did not stop there.

2.     *PLAINTIFFS EXPERIENCE INHUMANE CONDITIONS IN LA HIELERA*

20.     Plaintiffs' apprehension was the beginning of a two-month detainment marked by inhumane conditions—both physical and psychological—that have traumatized them and will continue to do so for years to come.  These conditions included, among other things, detention facilities that lacked necessities, such as beds, sufficient blankets, showers, food, and potable water.

21.     Also while detained in these facilities, CBP personnel deprived J.C.O.C. of his prescription anxiety medication, forcing him to weather the ensuing trauma with an untreated anxiety disorder.  It was in this context of extreme stress that CBP personnel forcibly separated J.C.O.C. from his nine-year-old daughter for two months, pursuant to the Family Separation Policy.  To worsen their separation, CBP officials would not tell J.C.O.C. where his daughter was, or if he

1    would ever see her again.  These circumstances left J.C.O.C. and M.M.O.S. severely traumatized,

2    the lingering effects of which they carry today.

3         22.    At the first detention facility (on information and belief, El Paso Del Norte Processing

4    Center), CBP personnel placed J.C.O.C. and M.M.O.S. together in a holding room filled with

5    migrant adult men and their children, ranging from infants to adolescents.  These CBP holding

6    rooms are notorious and commonly referred to as "*hieleras*" ("iceboxes" in Spanish) due to their

7    frigid cold temperatures and unforgiving concrete surfaces.  The *hielera* in which CBP personnel

8    placed J.C.O.C. and M.M.O.S. was no exception; the room was intensely cold at all times.

9         23.    The days that father and daughter spent in the *hielera* were agonizing.[5]  Because the

10   *hielera* lacked any windows or clocks, and the lights were constantly on regardless of time of day,

11   Plaintiffs became disoriented, losing track of how long they were in the *hielera*.

12        24.    The *hielera* was divided into several small cells, into which the detainees were

13   separated.  These cells were cramped, with some holding over ten people.  While detained in the

14   *hielera*, Plaintiffs suffered conditions that left them without sleep, without sufficient warmth,

15   without adequate food and water, and without access to basic privacy and hygiene facilities.  These

16   inhumane physical conditions contributed to and were exacerbated by the psychological distress that

17   CBP personnel subjected Plaintiffs to.

18        25.    The conditions of the *hielera* were so dehumanizing and degrading that J.C.O.C. felt

19   that CBP personnel were purposefully punishing him for seeking safety and a better life in the

20   United States.  The *hielera* conditions frightened M.M.O.S. that she rarely spoke during her time at

21   the facility—if at all.  The conditions caused J.C.O.C. to worry about his own and M.M.O.S.'s

22   wellbeing in CBP custody.

23

24   ---
[5]  In an urgent memorandum to then-Acting Secretary for the Department of Homeland Security

25   Kevin McAleenan, the Office of the Inspector General ("OIG") described the dehumanizing
     conditions at El Paso Del Norte.  Ex. 5, *Management Alert - DHS Needs to Address Dangerous*

26   *Overcrowding Among Single Adults at El Paso Del Norte Processing Center* (*Redacted*), DEP'T
     HOMELAND SEC., OFF. INSPECTOR GEN., May 30, 2019 (OIG-19-46), at 1 ("recommending that

27   [DHS] take immediate steps to alleviate dangerous overcrowding at the El Paso Del Norte
     Processing Center . . . . corrective action is critical to the immediate health and safety needs of

28   detainees"), https://www.oig.dhs.gov/sites/default/files/assets/2019-05/OIG-19-46-May19.pdf.

26.     While detained at the *hielera*, Plaintiffs were unable to sleep.  All the *hielera*'s surfaces, including the floor and small benches, were made of concrete that was frigid to the touch. Detainees in the *hielera*, including Plaintiffs, were only provided with a thin mylar blanket.  But this sheet was not enough for them to keep warm and allow them to rest.  There were also not enough blankets for everyone in the *hielera*.  One night, J.C.O.C. could not find a blanket, so he and M.M.O.S. had to sleep without any covering.  CBP personnel always kept the lights on in the *hielera* and constantly opened the door to the holding room to call people out or to bring new detainees in.

27.     J.C.O.C. and M.M.O.S. arrived dehydrated and hungry at the border after a difficult journey.  During their time in the *hielera*, CBP personnel did not provide J.C.O.C. and M.M.O.S. with access to potable running water and gave them only small portions of frozen burritos and drinks.  The amounts were lacking and sparingly given.  CBP personnel only fed the detainees twice a day, which was not enough to make Plaintiffs feel full.  Given the state in which Plaintiffs arrived at the border, their bodies suffered further from the insufficient food and lack of potable water.

28.     The inhumane conditions also included Plaintiffs' lack of access to privacy and hygiene facilities.  While at the *hielera*, CBP personnel did not allow Plaintiffs a chance to shower or bathe themselves.  There was one faucet in which all detainees in the *hielera* shared and could use to rinse their hands or face, but there were no shower facilities and no soap.  Plaintiffs were also not provided with a change of clothes or allowed to wash the clothes they wore when they were apprehended.  In the *hielera* cell where J.C.O.C. and M.M.O.S. were held, there was only a single toilet with a low door, which all detainees had to share.  The low door and cramped room meant that other detainees could see directly into the stall if they were standing.

29.     The cells of the *hielera* were so crowded that people had to sleep on the floor at the door of the toilet stall, further diminishing any privacy and worsening hygiene.  As a result, J.C.O.C. felt embarrassed for himself and M.M.O.S.  The *hielera* was full of men and boys, so J.C.O.C. attempted to protect his young daughter's privacy by holding up a covering while she used the bathroom.  On at least one occasion, a female CBP personnel forbade him from following M.M.O.S. to the toilet stall, despite his intentions to protect his daughter's privacy.  He tried to explain that

M.M.O.S. was his daughter, and that he was trying to protect her.  The female CBP personnel simply told him that he should not be there.  J.C.O.C. felt humiliated by the exchange.

30.     While these inhumane physical conditions were independently horrific, they were exacerbated by the psychological conditions that Plaintiffs suffered.  J.C.O.C. suffers from a serious anxiety disorder, for which he had been taking prescription anxiety medication for years before he was detained.  J.C.O.C. had this medication with him when he arrived in the United States.  On the second day that Plaintiffs were at the *hielera*, CBP personnel confiscated J.C.O.C.'s prescribed anti-anxiety medication, causing J.C.O.C. to endure excruciating anxiety attacks that manifested with severe physical symptoms, such as bouts of shortness of breath.  That J.C.O.C. weathered the inhumane conditions of the *hielera* and forced separation from M.M.O.S. with the added stress of untreated clinical anxiety, and had no certainty as to when he would receive medication again, all the further compounds the trauma he suffered during his detainment by Defendant.

31.     Without his medication, J.C.O.C. could not rest or calm his mind.  He suffered panic attacks and visible symptoms of his unchecked clinical anxiety every day.  His anxiety manifested into physical signs: he could not catch his breath, experienced heart palpitations and tremors, and felt a constant panic.  He physically felt like he was going to die and had no sense of time.

32.     After CBP personnel took away his anxiety medication, J.C.O.C. told them he needed to take his medication daily for his diagnosed anxiety disorder.  CBP personnel failed to return the medication.  Instead, they jeered: "You just came to leave your daughter here.  We're going to deport you."  CBP personnel repeatedly threatened to deport J.C.O.C. and separate him from his daughter.  The threat of being separated from his young daughter further exacerbated J.C.O.C.'s anxiety.

3.     *GOVERNMENT OFFICIALS FORCIBLY SEPARATE PLAINTIFFS WITH NO WARNING OR EXPLANATION*

33.     On approximately their third day in custody, armed CBP personnel began to call the fathers out of the holding cell for questioning, leaving the children behind in the *hielera*.  Sleepless, hungry, and without his medicine, J.C.O.C. heard the officers call his name.  With no choice but to leave the *hielera* where he could only hope that M.M.O.S. would be safe, J.C.O.C. tried to reassure

M.M.O.S., telling her not to worry and that he would return soon.  He assumed that he was being called away only for a short time.  J.C.O.C. could not have imagined that immigration officials were about to forcibly separate him from his daughter for two excruciating months, and neither could she.

34.    As CBP personnel led J.C.O.C. into a hallway to an interview room, they mocked him, asking what he was doing in their country and again threatening him: "We're going to deport you and take your daughter away from you."  This further intensified J.C.O.C.'s anxiety.  After entering the interview room, J.C.O.C. was cuffed by his wrists and ankles with a heavy metal chain wrapped around his waist, attaching the two sets of cuffs.  As J.C.O.C. was cuffed, suffering from disorientation and distress, CBP personnel continued their taunts and verbal attacks, telling him that he would be deported and that his daughter would be taken away.

35.    CBP personnel lined up J.C.O.C. with the other fathers whom they had called out from the cell.  CBP personnel told the fathers that they were going to jail because they had come to the United States illegally.  J.C.O.C. asked whether the children would be coming with them.  In response, CBP personnel lied to the parents, falsely assuring the concerned fathers that they would see their children at the "next location."  From there, the officers shackled the men, hand and foot, and led them onto a bus.  On information and belief, J.C.O.C. and other parents were shipped to *El Cemento* (or "The Cement" in Spanish).

36.    J.C.O.C. again tried to inquire with CBP personnel about his medication.  However, when he asked for it, he received the response: "Why do you need that?"  As he was transported away from the *hielera,* without his nine-year-old daughter, J.C.O.C. felt physical pain akin to "torture."  From there, his anxiety only intensified, leading him to have difficulty breathing, depression, and an accelerated heart rate.

37.    J.C.O.C. and M.M.O.S. never had a chance to say goodbye.  Later, once he realized what had happened, J.C.O.C. felt that the CBP personnel had tricked him and the other fathers into leaving their children behind in the *hielera*.  He felt confused, lied to, and betrayed by the CBP personnel's cruelty.  The only explanation immigration officials gave him was that he and the other men would go to prison because they had come to the United States illegally.  J.C.O.C. felt that

forcibly separating him from M.M.O.S. and sending him to jail was the government's way of

punishing him and his daughter for seeking a safer life in the United States.

4.   *M.M.O.S. IS SENT TO FLORIDA WHILE J.C.O.C. IS TRANSFERRED BETWEEN NUMEROUS DETENTION FACILITIES*

38.   M.M.O.S. remained in CBP custody at El Paso Del Norte without her father.  After

her father was transferred from CBP custody, CBP personnel transferred M.M.O.S. "pending

placement" to Clint Border Patrol Station ("Clint Station") located at 13400 Alameda Avenue, Clint,

Texas 79836.[6]  M.M.O.S. remained in CBP custody at Clint Station for an unknown period.

Eventually, M.M.O.S. was transferred to ORR custody.  Federal agents did not explain to M.M.O.S.

where she was being taken or why, or whether or when she would ever see her father again.

39.   M.M.O.S. was subsequently transferred to His House Children's Home ("His

House") on or about May 30, 2018 as an unaccompanied non-citizen child (previously termed

unaccompanied alien child, "UAC").  His House is a private contractor with ORR, and it is almost

two-thousand miles from where J.C.O.C. was forcibly separated from M.M.O.S.  Medical records

show that M.M.O.S. was given almost twenty vaccinations while in ORR custody.  With no parent

to consent to this treatment, the records show that ORR designated "His House" as M.M.O.S.'s

consenting guardian.  With no idea where her father was and alone in a foreign country at the age of

nine, M.M.O.S. remembers feeling terrified.  Government records indicate that M.M.O.S. struggled

with feelings of sadness and frustration while detained at His House.  She felt "triggered" by

memories of her family, and she expressed that she longed to be back with them.

40.   Back in Texas, after immigration officials boarded J.C.O.C. onto the bus from the

CBP station, they transferred him to a detention facility which he heard other detainees refer to as *El

Cemento*.  Government records indicate this location may have been the El Paso County Detention

---

[6]  Clint Station has been subject to significant reporting for its notoriously unhygienic, inhumane, and traumatizing conditions in which separated children were detained after suffering forcible separation from their parents. Ex. 6, Simon Romero et al., *Hungry, Scared and Sick: Inside the Migrant Detention Center in Clint, Tex.*, N.Y. TIMES, July 9, 2019, https://www.nytimes.com/interactive/2019/07/06/us/migrants-border-patrol-clint.html ("Outbreaks of scabies, shingles and chickenpox were spreading among the hundreds of children . . . . The stench of the children's dirty clothing was so strong it spread to the agents' own clothing").

Facility, a maximum-security federal facility located at 601 East Overland Avenue, El Paso, Texas 79901.  He spent approximately one month detained there, although he was never convicted of any crime.[7]

41.    At *El Cemento*, officials issued J.C.O.C. a uniform in exchange for his own clothes and finally allowed him to bathe—his first opportunity to do so after he was detained.  However, these showers were in open locations, meaning that J.C.O.C. had no privacy, which made him vulnerable and uncomfortable.

42.    Upon arrive at *El Cemento*, J.C.O.C. again asked for medication to treat his anxiety condition and was told by officials to wait.

43.    During his month at *El Cemento*, J.C.O.C. did not know where his daughter was, whether she was safe, or if he would ever see her again.  While at *El Cemento*, J.C.O.C. was not allowed to contact his daughter.  Despite his pleas, officials at the facility refused to provide him with information about M.M.O.S.'s whereabouts or wellbeing.  J.C.O.C. barely slept; he was too distraught by the separation from his daughter and the complete lack of information about her wellbeing.  He suffered constant anxiety.

44.    Around June 27, 2018, government officials transferred J.C.O.C. to a detention center several hours away.  None of the personnel involved in the transfer or at the facilities on either end informed J.C.O.C. of where he was going or why.  When J.C.O.C. was transferred, he felt ill and depressed.  He continued to have difficulty breathing, and constantly felt his heart rate was accelerating.  Government records indicate that this new destination may have been West Texas Detention Facility, located at 401 South Vaquero Avenue, Sierra Blanca, Texas 79851.  J.C.O.C. heard this place referred to as "Sierra Blanca."

45.    Detained with J.C.O.C. were other men who were born in the United States, but had been arrested for crimes.  There were also other men who were not U.S. citizens and had been arrested for controlled substance trafficking or using false documents to enter the country.  Being

---

[7]  Court records indicate that J.C.O.C. was indicted for an alleged violation of 8 U.S.C. § 1326, but that the indictment was dismissed on June 25, 2018.  A later date set for plea and sentencing was cancelled on June 29, 2018.  J.C.O.C. was never convicted of the charge.

grouped together with these other men made J.C.O.C. feel criminalized and unsafe, which only heightened his feelings of anxiety and fear.  J.C.O.C. spent about two weeks in Sierra Blanca.  As at *El Cemento*, J.C.O.C. was given a uniform to wear.

46.     At Sierra Blanca, J.C.O.C. had his first opportunity to submit a formal request to see a mental health professional.  He submitted the formal request with the detention officials, informing them that he had an anxiety condition for which he was prescribed medication.  At Sierra Blanca, J.C.O.C. saw a mental health professional and was given medication for his anxiety condition.

47.     At Sierra Blanca, J.C.O.C. also was able to call a cousin that lived in the United States to help him locate M.M.O.S.  His cousin found a number that family members could call to try to locate separated children.  Through this number, the cousin learned that M.M.O.S. was being held at a shelter in or near Miami, Florida.  The cousin then relayed this information to J.C.O.C. and provided him with the number of a social worker at the shelter.  After spending over a month repeatedly asking about his daughter's whereabouts, J.C.O.C. paid to call the social worker in Miami who scheduled a time for him to speak with M.M.O.S.

48.     The initial call was J.C.O.C.'s first glimmer of hope since he and M.M.O.S. had been apprehended over a month prior.  The social worker encouraged M.M.O.S. to speak to her father, who asked questions about how she was.  He felt a momentary rush of happiness as he heard his daughter's voice.  Although she was happy to speak to him, he noticed unusual sadness and reservedness in her voice.  Hearing this, J.C.O.C. became even more anxious.  J.C.O.C. asked M.M.O.S. if anything was wrong, but she would not elaborate.  J.C.O.C. remembers that this first call lasted less than twenty minutes.

49.     Over the remaining month of their separation, J.C.O.C. was only able to speak with M.M.O.S. three times, each time with her social worker at the shelter.  During these calls, J.C.O.C. would ask M.M.O.S. how she was doing and if she had spoken to her mother.  M.M.O.S. mentioned that she was studying in school, but remained abnormally quiet.

50.     J.C.O.C. felt terrible sadness and worry each time he and M.M.O.S. spoke.  Although he had his medication again, he continued to feel stressed, more stressed than he had ever remember

feeling.  And despite speaking to his daughter, J.C.O.C. did not know when or if he would see her

again.

51.     Government records show that following J.C.O.C.'s custody in Sierra Blanca, ICE

officials transferred him to a private, for-profit prison, Otero County Processing Center ("Otero"),

located at 26 McGregor Range Road, Chaparral, New Mexico 88081, on or about July 10, 2018.

This was J.C.O.C.'s fourth detention facility in two months.  In Otero, J.C.O.C. was placed with

people convicted of even more serious crimes than when he was in *El Cemento* or Sierra Blanca.

J.C.O.C. remembers feeling unsafe in this environment.

52.     Sometime in mid to late July 2018, while J.C.O.C. was still detained at Otero, he

heard rumors that families were to be reunited.  The detainees had learned details about family

reunification from Spanish-language television news reports—not government officials.  Only after

facing questions from detainees did ICE officials finally confirm that a lawsuit had ordered parents

to be reunified with their children.[8]  Officials then advised detainees to prepare letters to the judge

that would allow them to be reunited with their children.  J.C.O.C. wrote his letter without ICE

officials' guidance.

53.     About five days after the rumors first circulated, J.C.O.C. heard ICE officials calling

parents' names.  He grew nervous and hoped that his name would be called.  Despite this hope,

J.C.O.C. was haunted by the last time he was in a similar situation—when CBP personnel called his

name, then separated him from his daughter.  ICE officials did indeed call J.C.O.C.'s name.

J.C.O.C. and the other separated parents were then bussed to what appeared to be a temporary

encampment structure that reminded J.C.O.C. of a church.  Soon after, cars began arriving to the

encampment, and J.C.O.C. saw groups of children emerge from the cars.  In that moment, J.C.O.C.

saw M.M.O.S. walk towards him.  He was filled with happiness to see his daughter.  Over the prior

two months, he had continuously feared that he would never see M.M.O.S. again.  J.C.O.C. and

---

[8]  Federal Judge Dana Sabraw of the Southern District of California ordered the federal government
to begin reunifying families during this period. *Ms. L v. U.S. Immigr. & Customs Enf't*, 310 F. Supp.
3d 1133, 1149–50 (S.D. Cal. June 26, 2018) (ICE and "all those who are in active concert or
participation with them, are preliminary enjoined from continuing to detain the minor children of the
Class Members and must release the minor child to the custody of the Class Member").

M.M.O.S. both cried when they were finally reunited.  Although J.C.O.C. felt joy to be with M.M.O.S., the fear that CBP would take his daughter again haunted him.

54.    After they were reunited, immigration officials—most likely ICE—then took J.C.O.C. and M.M.O.S. to an office in an unknown location where they placed a monitoring device on J.C.O.C.'s ankle.  Officials then left the father and daughter at a non-government shelter in an unknown location.  Shelter staff provided them food and clothing, and then helped them pay for a plane ticket to their destination in California, where they have lived since.

55.    Government records show that J.C.O.C. was released from ICE custody on about July 22, 2018.  It is unclear whether this was the date ICE officials transferred him to the separate location where he and M.M.O.S. were reunited, or when J.C.O.C. and M.M.O.S. were ultimately released from immigration detention.

5.    *PLAINTIFFS SUFFER LASTING HARM FROM THEIR FORCED SEPARATION*

56.    The federal government's forcible separation and detention continues to cause J.C.O.C. and his daughter M.M.O.S. severe emotional pain.  The government's intentionally cruel Policy of separating children from their parents to deter migration, and its failure to track the children once they were separated, violated J.C.O.C.'s and M.M.O.S.'s constitutional right to family integrity.[9]  Government officials and their agents implemented this policy to inflict emotional distress on the families that they separated.

57.    After their release, J.C.O.C. felt disoriented, depressed, and traumatized.  He was confused by what had happened to him and his daughter.  When they were reunited, M.M.O.S. feared that they would be separated again.  M.M.O.S. also showed symptoms of trauma.  She was nonverbal after the reunification; when she did speak (barely), she presented a flat affect.  For both J.C.O.C. and M.M.O.S., healing from the trauma of their separation and detention has been a slow process—one that may never be fully complete.

58.    Since the separation, J.C.O.C. continues to suffer severe anxiety.  He underwent psychotherapy and was prescribed sertraline for psychological condition.  Today, J.C.O.C. still takes medication for his clinical anxiety.  Mental health practitioners treating J.C.O.C. have noted that his

---

[9]  *Ms. L*, 310 F. Supp. 3d at 1143, 1148.

forced separation from his daughter, deprivation from his anxiety medication, and prolonged

detention reactivated and exacerbated some of his pre-existing mental health conditions.  J.C.O.C.

still expresses hopelessness over how his daughter was "snatched away from him" and fears losing

her again.  Both J.C.O.C. and M.M.O.S. exhibited signs of the sort of trauma that experts have

linked to the Family Separation Policy.[10]  In the years since their separation, both father and

daughter have begun to recover from the trauma they suffered while detained under the Family

Separation Policy.  But their paths to fully healing from the trauma is uncertain.

### B.    BY IMPLEMENTING THE FAMILY SEPARATION POLICY, GOVERNMENT OFFICIALS AIMED TO DETER MIGRATION AT THE SOUTHERN BORDER

59.    J.C.O.C. and M.M.O.S. were victims of the Family Separation Policy—a policy by

which the federal government separated families to deter their migration.  The goal of the Family

Separation Policy was as simple as it was heinous.  It aimed to cause families intense trauma, draw

public attention, and deter other migrants from seeking protection or a better, safer life in the United

States.  Through this Policy, the federal government actualized its goal, enacting lasting harm on

migrant families, including Plaintiffs.

60.    The Family Separation Policy unfolded in four phases: (i) family separation

proposals, (ii) the El Paso Pilot Program, (iii) border-wide Family Separation Policy implementation,

and (iv) termination without a plan for reunification.  Such a large-scale policy required

collaboration by many institutional actors.  Various federal agencies implemented different aspects

and phases of the Policy.  Their execution of the Policy betrayed a level of callousness and cruelty

with few counterparts in modern U.S. history.

61.    Throughout the Family Separation Policy, experts warned federal officers of the harm

that the Policy would cause migrant families.  The harm was no ancillary accident, but rather a

systematic, targeted, and intentional design of the Policy.  The Policy seems to have been

constructed to exact as much harm as possible on migrant families.  Federal officers terrorized

---

[10]  *See* Ex. 7, *You Will Never See Your Child Again: The Persistent Psychological Effects of Family Separation*, PHYSICIANS FOR HUMAN RIGHTS, Feb. 2020 (Full Report), at 20–22, https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf [hereinafter PHR, *You Will Never See Your Child Again*].

families as they separated parents and children—with no plan to reunite them.  After separating the families, federal officers refused to provide information about one another's welfare and whereabouts.  Federal officers also failed to facilitate communication between the parents and children that they separated, and intentionally neglected to track the families they separated.  This meant that when the government was forced to end the Policy, many parents and children could not be reunited.

62.     The government justified the Family Separation Policy as a law enforcement mechanism, but prosecutions were never the point.  Indeed, a significant percentage of parents were never prosecuted or even referred for prosecution, but still had their children ripped from their arms.  And, if prosecuted, most parents charged with illegal entry were sentenced to time served but remained separated from their children for months.  Such criminal proceedings were a tool to facilitate and legitimize family separation.  The real deterrent—the one the government believed would stop parents cold—was the threat of losing their children.  The government caused indelible harm to thousands of families who came to the United States seeking safety, including Plaintiffs.

### 1.   *OFFICIALS PROPOSE SEPARATING FAMILIES TO DETER MIGRATION*

63.     Proposals for a family separation policy as a deterrent mechanism were initially met with strong governmental pushback.  Federal law guarantees any non-citizens on U.S. soil or at ports of entry the unqualified right to seek asylum and related humanitarian protections.[11]  The asylum statute, codified in the Refugee Act of 1980, was meant to welcome homeless refugees to American shores.[12]

64.     But when Donald Trump became President, he brought with him a wave of anti-immigration sentiment fueled by campaign promises to prevent migrants from seeking asylum.  Indeed, it was "his signature campaign issue."[13]  Throughout his presidency, Trump continued his

---

[11]  *See* 8 U.S.C. § 1158(a)(1) (asylum); 8 U.S.C. § 1231(b)(3) (withholding of removal); 8 C.F.R. § 208.1 (protection under the Convention Against Torture).

[12]  S. REP. NO. 96-256, at 1 (1979) 96th Cong., 1st Sess. 1 (1979), *reprinted in* 1980 U.S.C.C.A.N. 141, 141, 1979 WL 10382 (Leg. Hist.).

[13]  Ex. 8, Mimi Dwyer, *Factbox: How Trump Followed Through on His Immigration Campaign Promises*, REUTERS (Aug. 14, 2020), https://www.reuters.com/article/us-usa-immigration-election-factbox/factboxhow-trump-followed-through-on-his-immigration-campaign-promises-idUSKCN25A18U.

advocacy of sealing the borders to migrants seeking protection from persecution, declaring: "When people, with or without children, enter our Country, they must be told to leave without our Country being forced to endure a long and costly trial."[14]  His administration began looking for ways to follow through on these promises.  They locked in on an idea that was initially raised as early as 2014: deterrence through family separation.

65.     The Trump-era rhetoric contrasted with what the prior administration condoned. Back in 2014, then-Secretary of Homeland Security Jeh Johnson called for a meeting with high-ranking border-enforcement officials to discuss methods of deterring migrants from the southern border.  In attendance at meeting was Thomas Homan, then-Executive Associate Director of Enforcement and Removal for ICE.[15]  There, Homan first proposed the heinous idea of family separation.  Specifically, he proposed that the U.S. government should prosecute families who crossed the border with their children, which would cause the parents to be taken into federal custody, enabling the government to separate children from parents.[16]  Johnson rejected Homan's idea, saying it was "heartless *and* impractical."[17]

66.     Indeed, this idea represented a major shift from the approaches DHS and DOJ had taken to prosecuting family units.  Historically, DHS placed families apprehended at the border in administrative deportation proceedings without referring parents for criminal prosecution, maintaining the family unit.[18]  Similarly, for years the DOJ sought to preserve the family unit and

---

[14]  Ex. 9, Emma Platoff et al., *While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, TEX. TRIB. (July 10, 2018), https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/.

[15]  Ex. 10, Caitlin Dickerson, *We Need to Take Away Children: The Secret History of the U.S. Government's Family-Separation Policy*, ATLANTIC, Aug. 7, 2022, at 42 [hereinafter The Atlantic, *We Need to Take Away Children*].

[16]  *Id.*

[17]  *Id.* at 43 (emphasis in original).

[18]  Ex. 11, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services*, DEP'T JUST., OFF. INSPECTOR GEN., Jan. 2021 (Revised) (21-028), at i, https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf [hereinafter DOJ Jan. 2021 OIG 21-028 Report].

generally declined to refer parents migrating with children for prosecution of immigration related offenses.[19]

67.     Despite being initially dismissed, this "heartless" idea resurfaced under the Trump administration, this time with more senior proponents.  The most prominent proponent was Stephen Miller, then-President Trump's senior adviser on immigration.  In early 2017, Miller pitched to then-Secretary of Homeland Security John Kelly the idea of separating families at the border.[20]  Kelly initially rebuffed this idea for moral and practical reasons.[21]  Kelly had asked for a review of the policy, which showed that it presented a logistical nightmare.  A family separation policy would require hundreds of millions of dollars to build the requisite detention facilities and would take months to train staff across multiple departments.[22]

68.     Despite the issues, Kelly stated that DHS was "considering [separating families] in order to deter more movement along [the border]."[23]  Internal DHS emails confirm this: an email sent by the Assistant DHS Secretary for Internal Affairs notes that "the 'separating families' issues" were discussed at one of the Department's "morning huddle[s]."[24]  Shortly after, the federal government piloted separating families in El Paso while Kelly was Secretary of Homeland Security.

2.     _CBP LAUNCHES FAMILY SEPARATION PILOT PROGRAM IN EL PASO_

69.     The United States piloted the Family Separation Policy to see if it would effectively deter migrant families from seeking refuge in the United States (the "Pilot Program").  The Pilot Program was based in Border Patrol's El Paso sector and ran from March through November 2017.  Through the Pilot Program, federal immigration officials began separating families for two purposes: to pressure migrant parents into foregoing their asylum claims and to deter future migration.  It

---

[19]  Ex. 11, DOJ Jan. 2021 OIG 21-028 Report at 1–2.
[20]  Ex. 10, The Atlantic, _We Need to Take Away Children_ at 44.
[21]  _Id._
[22]  Ex. 10, The Atlantic, _We Need to Take Away Children_ at 44.
[23]  Ex. 12, _The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos_, H. COMM. ON THE JUDICIARY, at 6 (Oct. 2020) (Majority Staff Rep.), https://s3.documentcloud.org/documents/23561151/the_trump_administration_family_separation_policy_trauma_destruction_and_chaos.pdf [hereinafter Majority Staff Report, _Trump Administration's Family Separation Policy_).
[24]  _Id._

sought to actualize these two goals by prosecuting migrant parents and labeling their children as UACs, greatly harming migrant families that were separated in El Paso.

70.    In response, experts warned the federal agencies in charge of this Pilot Program of the harm that it caused, and the harm that it could cause if implemented on a larger scale.  But these warnings would not deter the federal government from enacting a large-scale Family Separation Policy because that harm was the government's goal.

a.    ***The Pilot Program Separates Families to Deter Migration***

71.    Separating families through the Pilot Program represented a departure from the government's prior policy of maintaining family units at the border.  As a Border Patrol official explained to Jim Tierney, the then-acting U.S. Attorney for the District of New Mexico, "it is the hope that this separation will act as a deterrent to parents bringing their children into the harsh circumstances that are present when trying to enter the United States illegally. . . . It is expected that once immigrants become aware that there is a higher probability of being prosecuted and separated if apprehended in Texas, the traffic will move to the areas surrounding the New Mexico Stations."[25] Put differently, the Pilot Program sought to assess whether family separation would deter migration.

72.    Under the Pilot Program, Border Patrol agents began referring parents for criminal prosecution of misdemeanor border-crossing charges to separate them from their children.  To accomplish the intended family separation, immigration officials exploited a provision of the Trafficking Victims Protection Reauthorization Act ("TVPRA") to pretextually justify seizing long-term custody of the child from the parent.

73.    The TVPRA is intended to protect children who arrive in the United States without a parent; it was not meant to apply to those children who were forcibly separated from their families. TVPRA defines a UAC as a child who is under eighteen, lacks lawful immigration status, and for whom "there is no parent or legal guardian in the United States; or no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).  Classifying these children as UACs was integral to separating families because when a child is classified as a UAC, the TVPRA requires that custody of the child transfer to HHS.  So, when immigration

---

[25] Ex. 11, DOJ Jan. 2021 OIG 21-028 Report at 15, n.30.

officials prosecuted parents, they could manipulate the custody status of the accompanying children, even if the parents originally could provide physical care. By classifying the children as UACs, immigration officials were allowed to separate them from their parents.

74.     After separating a child from their accompanying parent, immigration officials whisked the child off to HHS, even though the government knew the precise location of the child's parent at the time of separation. During the Pilot Program, DHS officials generally transferred separated parents to U.S. Marshals Service for prosecution under 8 U.S.C. § 1325, a misdemeanor border-crossing offense. Soon after, the parent was transferred back to civil immigration custody with a "time served" sentence.[26] Meanwhile, the child remained detained in civil immigration custody by HHS, separated from his or her family.

75.     The Pilot Program resulted in the separation of at least 868 children, some of whom included breast-feeding mothers and their infants.[27] Despite this, the government implemented no mechanisms to allow separated parents and children to locate one another. To further compound the issues, DHS and DOJ, which planned and implemented the Pilot Program, did not inform ORR of the new separation policy or that the children being sent to their custody had been separated from arriving parents.[28] As a result, the government did not track the families it separated. This meant that parents and children were indefinitely separated, with no means of communication and little chance of ever being reunited.[29]

        b.     ***Experts Advised Government Officials that Separation Would Cause Severe Psychological Trauma***

76.     In response to the Pilot Program, a broad range of experts informed the federal agencies of the harm that family separation caused. As the effects of the Pilot Program became apparent over the program's existence, there was immediate backlash from prosecutors, judges, and

---

[26] *See* Ex. 11, DOJ Jan. 2021 OIG 21-028 Report at 3-7, 14–17.
[27] Ex. 13, Caitlin Dickerson, *We Need to Take Away Children: The Secret History of the U.S. Government's Family-Separation Policy*, ATLANTIC, Aug. 7, 2022, at ch. 3, https://www.theatlantic.com/magazine/archive/2022/09/trump-administration-family-separation-policy-immigration/670604/.
[28] Ex. 12, Majority Staff Report, *Trump Administration's Family Separation Policy* at 7.
[29] Ex. 11, DOJ Jan. 2021 OIG 21-028 Report at 15–17.

other stakeholders.[30]  For example, DHS began receiving complaints through its Office of Civil Rights and Civil Liberties describing the extreme trauma that separation caused adults and children, which highlighted the "needless cruelty" of the separations.[31]  These complaints, however, did not dissuade the government from pursuing family separation because the harm it caused was the very intention of the Policy.

77.     Internal government officials openly critiqued family separation.  In response to family separation, John Bash, then-acting U.S. Attorney for the Western District of Texas, remarked: "History would not judge [prosecuting family units] kindly."[32]  Magistrate Judge Miguel Torres of the Western District of Texas presided over many of the resulting criminal prosecutions and documented that criminal defense attorneys and defendants had "repeatedly" voiced concerns "regarding their limited and often non-existent lack of information about the well-being and whereabouts of their minor children from whom they were separated at the time of their arrest."[33]  The *Houston Chronicle* also widely reported such concerns, quoting from a study that alleged, "There aren't mechanisms in place to systematically allow a parent or child to locate one another once they have been separated. . . . Family members lose track of each other."[34]

78.     After the Pilot Program ended in 2018, then-U.S. Attorney for the Western District of Texas John Bash was asked to brief DOJ officials about the initiative.  Notes from the briefing, which reference Judge Torres and the *Houston Chronicle,* indicate that Bash most likely discussed the "significant pushback"[35] regarding family separation.  His notes further foretold: "ORR may have become overwhelmed and asked for relief."[36]

79.     Officials inside the government continued to voice concerns about the harmful effects of the Pilot Program, even after it ended.  In fact, following the Pilot Program, some government officials publicly disavowed it because of the suffering it caused.  Backlash to the Pilot Program was

---

[30] Ex. 11, DOJ Jan. 2021 OIG 21-028 Report at 18.
[31] Ex. 12, Majority Staff Report, *Trump Administration's Family Separation Policy* at 10.
[32] Ex. 11, DOJ Jan. 2021 OIG 21-028 Report at 14.
[33] *Id.* at 17.
[34] *Id.*
[35] *Id.* at 18 (internal quotations omitted).
[36] *Id.*

so strong that U.S. Attorney Bash thought "the idea [had been] abandoned" and would not be implemented nationwide.[37]  Shortly after, United States Public Health Service Commissioned Corps Commander Jonathan White, who was then detailed to HHS as the Coordinating Official and Incident Commander for Unaccompanied Alien Children Program, expressed to senior ORR leadership that a family separation policy would "be inconsistent with our legal requirement to act in the best interest of the child."[38]

80.     Officials outside of the government also directly criticized the Pilot Program.  After learning that the administration was considering a border-wide family separation policy, the American Academy of Pediatrics ("AAP") wrote directly to DHS six times regarding the harmful effects of the Pilot Program.  AAP also issued multiple public statements noting that "family separation devastates the most basic human relationship we know, that of parent and child."[39]  As a result, high-level policymakers knew that separating migrant children from their parents would cause harm.  Experts' warnings showed government officials that the Pilot Program had worked as intended, and that large-scale separation would harm families.

c.     ***Federal Employees Warn that Agencies Are Unprepared to Facilitate Separation***

81.     In addition to experts' concerns about the effects of family separation, federal employees warned government officials that the agencies were unprepared to accommodate a large-scale family separation policy.  Throughout the Pilot Program, ORR employees noted the rise in separated children that their facilities had to accommodate.  This increase in separated children led ORR to have significant issues caring for the larger number of UACs.  Employees reported that there

---

[37] Ex. 11, DOJ Jan. 2021 OIG 21-028 Report at 19.

[38] Commander White provided this as sworn testimony.  Ex. 14, *Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the H. Subcomm. on Oversight and Investigations*, 116th Cong. (Feb. 7, 2019) at 1114–38, 1514–19, 2363–67 (testimony of Commander Jonathan White, U.S. Public Health Service Commissioned Corps), https://docs.house.gov/meetings/IF/IF02/20190207/108846/HHRG-116-IF02-Transcript-20190207-U1.pdf [hereinafter Feb. 7, 2019 Hearing Before the H. Subcomm. on Oversight and Investigations].

[39] Ex. 14, Feb. 7, 2019 Hearing Before the H. Subcomm. on Oversight and Investigations at 3220–35 (testimony of Dr. Julie Linton, Co-Chair of the American Academy of Pediatrics Immigrant Health Special Interest Group).

---

was a shortage of beds for babies and that children were experiencing the harmful effects of being separated from their parents.[40]

82.     Then-Deputy Director for Children's Programs contacted senior CBP and ICE officials to express concern about the increased number of separated children in ORR's custody.  He cautioned that ORR would have insufficient bed capacity if DHS implemented a larger-scale separation program.  He also warned that ORR did not have the necessary equipment to care for very young children.  Beyond the inability of ORR to meet the children's needs, the Deputy Director warned CBP and ICE officials that separation would harm children and undermine ORR's obligation to safeguard the children's best interests.[41]

83.     DHS dismissed ORR's concerns and advised the agency to not plan for continued increases in the number of separated children because DHS "did not have an official policy of separating parents and children."[42]  Additionally, HHS senior officials did not facilitate any preparation for a contingency where a larger family separation policy was implemented.  This meant that when the Family Separation Policy was implemented, ORR was unprepared to accommodate the thousands of children that were separated from their parents.

3.     *IMMIGRATION OFFICIALS IMPLEMENT FAMILY SEPARATION POLICY, INTENDING TO HARM FAMILIES*

84.     With full knowledge of the harm the Pilot Program inflicted on migrant families, immigration officials implemented the Family Separation Policy.

---

[40]  Ex. 15, *Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy*, DEP'T. HEALTH & HUM. SERVS., OFF. INSPECTOR GEN., Mar. 2020 (OEI-BL-18-00510), at 15–16, https://oig.hhs.gov/oei/reports/oei-BL-18-00510.pdf [hereinafter HHS Mar. 2020 OIG OEI-BL-18-00510 Report].

[41]  Ex. 15, HHS Mar. 2020 OIG OEI-BL-18-00510 Report at 15–16; *see also* 6 U.S.C. § 279(b)(1)(B) ("ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child").

[42]  Ex. 16, *Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border*, U.S. GOV' ACCOUNTABILITY OFF., Oct. 2018 (GAO-19-163), at 14, https://www.gao.gov/assets/gao-19-163.pdf.

---

a.    ***Federal Agencies Propose Border-Wide Family Separation,***
***Knowing Harm Caused and Operational and Legal Risks***

85.    Federal agencies still proposed border-wide family separation, despite knowing of the harm the Pilot Program caused, and the policy's operational and legal risks.  For instance, at a February 14, 2017 meeting, DHS, CPB, ICE, and ORR officials heard presentations on how family separation could be a "deterrence initiative aimed at de[t]erring family unit migration."[43]  At this meeting, ICE officials Timothy Robbins, Matthew Albence, and Kevin McAleenan "consistently and clearly" presented family separation as a deterrence initiative.[44]  Officials hoped that family separation would send the message to Latin American migrants that, if they came to the United States as "part of a family," the parents would lose their children.[45]  It was clear to the officials at this meeting that the purpose of family separation was to "harm children and families."[46]

86.    It had also been made clear to officials that family separation would pose operational risks unless proper procedures were implemented to track the separated families.  Despite this, attendees at the February 2017 conference report that there was no discussion of how the agencies would handle reunification.[47]

87.    Attendees of this meeting also understood the legal risks that family separation posed.  Associate Deputy Director of ORR, Tricia Swartz, worried that they "were all going to go to the Hague" for crimes against humanity.[48]  Later, ORR Deputy Director for Children's Programs, Jonathan White, testified that he "believe[d] that the [February 14, 2017] conversation we had just

---

[43]  Ex. 17, Revised Public Opposition to Defendant's Motion for Summary Judgment at 2, *A.P.F. v. United States*, No. 20-65 (D. Ariz June 7, 2023), ECF No. 431 [hereinafter *A.P.F.* Revised Opposition to Defendant's MSJ].

[44]  Ex. 18, Exhibit 3 to Revised Public Plaintiffs' Amended Rule 56.1 Controverting and Supplemental Statement of Facts in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment at 8:24–25, *A.P.F. v. United States*, No. 20-65 (D. Ariz. June 7, 2023), ECF No. 432-1.

[45]  Ex. 17, *A.P.F.* Revised Opposition to Defendant's MSJ at 2–3.

[46]  *Id.* at 3.

[47]  *See* Ex. 19, Revised Public Plaintiffs' Amended Rule 56.1 Controverting and Supplemental Statement of Facts in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment at ¶¶ 17, 20, *A.P.F. v. United States*, No. 20-65 (D. Ariz. June 7, 2023), ECF No. 432-1.

[48]  Ex. 17, *A.P.F.* Revised Opposition to Defendant's MSJ at 3.

been in involved human rights violations . . . because of what I understood to be the foreseeable consequences of wholesale family separation on children."[49]

88.     Several inter-agency memos also proposed border-wide family separation as a deterrence mechanism.  In August 2017, a group of DHS officials drafted memos outlining a further range of policies designed to reduce the number of asylum seekers entering the United States.  One of the proposals involved family separation.[50]  Later, in an email dated December 11, 2017, Thomas Blank, the Chief of Staff of ICE, described how the agency had been asked to take the lead on drafting a decision memo regarding "separating Family Units."[51]

89.     Another inter-agency memo, sent on December 16, 2017, and entitled "Policy Options to Respond to Border Surge of Illegal Immigration," was circulated between high-level officials at DHS and DOJ.[52]  The memo recommended that the government adopt many of the same processes that had defined the Pilot Program, including "separating family units, placing the adults in detention, and placing the minors . . . in the custody of HHS as unaccompanied alien children."[53]  The memo specifically contemplated that "the increase in prosecutions would be reported by the media and it would have substantial deterrent effect."[54]

90.     To mitigate the legal risks that family separation posed, the memo further recommended that "[Border Patrol and ICE] work with DOJ to significantly increase the prosecution of family unit parents when they are encountered at the border."[55]  As a result, "parents would be prosecuted for illegal entry (misdemeanor) or illegal reentry (felony) and the minors present [with

---

[49]  Ex. 17, *A.P.F.* Revised Opposition to Defendant's MSJ at 3.
[50]  Ex. 20, Jonathan Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids from their Parents*, NEW YORKER, May 30, 2018, https://www.newyorker.com/news/news-desk/how-the-trump-administration-got-comfortable-separating-immigrant-kids-from-their-parents.
[51]  Ex. 21, *A Timeline of the Trump Administration's Family Separation Policy*, AM. OVERSIGHT (last updated Jan. 4, 2023), https://www.americanoversight.org/a-timeline-of-the-trump-administrations-family-separation-policy.
[52]  *Id.*
[53]  Ex. 11, DOJ Jan. 2021 OIG 21-028 Report at 12.
[54]  *Id.*
[55]  *Id*.

them] would be placed in HHS custody as UACs."[56]  Prosecution was intended to protect the Policy from legal scrutiny by providing an alternative explanation for family separation.[57]

91.     Further, beyond knowing the immediate harm that family separation would cause families, government officials were aware of the obvious fact that family separations would inflict lasting emotional trauma.  In a Senate Judiciary Committee hearing about the family separation, a former ORR official testified "[t]here's no question that separation of children from parents entails significant potential for traumatic psychological injury to the child."[58]

92.     After spending months crafting a policy that would exact such extreme suffering on families that asylum seekers would be too afraid to come to the United States, the government implemented the Family Separation Policy.  Under this Policy, the government intended for families to suffer, and the legal and operational risks it posed were not enough to halt the government in its mission to harm families.

b.     ***Officials Forcibly Separate Thousands of Families with No Plan to Reunite Them***

93.     Knowing that separations would cause migrant children and parents severe harm, the United States nevertheless began implementing the Family Separation Policy border-wide on April 6, 2018.  It was unveiled in a memo from then-Attorney General Jeff Sessions titled "Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)."[59]  This Zero Tolerance Policy—which was part of the Family Separation Policy's implementation—used prosecuting parents crossing the border as a pretext for designating their children as UACs.  As under the Pilot Program, the children designated as UACs could be sent to HHS facilities far away from where their parents were detained.

---

[56]  Ex. 11, DOJ Jan. 2021 OIG 21-028 Report at 12.
[57]  Ex. 22, Scott Shuchart, *Careless Cruelty*, WASH. POST, Oct. 25, 2018, https://www.washingtonpost.com/news/posteverything/wp/2018/10/25/feature/civil-servants-said-separating-families-was-illegal-the-administration-ignored-us/.
[58]  Ex. 23, Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE, July 31, 2018, https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html.
[59]  Ex. 24, *Memorandum for Federal Prosecutions Along the Southwest Border*, OFF. ATT'Y GEN. (Apr. 6, 2018), https://www.justice.gov/opa/press-release/file/1049751/download [hereinafter OAG Apr. 2018 Zero Tolerance Memorandum].

94.     Government officials acknowledged that the actual goal of the Zero Tolerance Policy was separating families.  After implementing the Policy, then-Attorney General Sessions, ignoring that most arriving parents come to the United States with their own children, stated: "If you smuggle illegal aliens across our border, then we will prosecute you.  If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law."[60]

95.     On May 11, 2018, Sessions stated his goal even more clearly.  During a conference call with the five U.S. Attorneys responsible for jurisdictions at the southwest border, he declared: "we need to take away children."[61]  When subsequently asked during an interview on Fox News whether family separations were being used as a deterrent, Sessions responded: "yes, hopefully people will get the message."[62]

96.     Around that same time, John Kelly, by then the White House Chief of Staff, was asked why the United States was separating families from their children.  He responded that "a big name of the game is deterrence" and that family separation "would be a tough deterrent."[63]  The then-acting Assistant Secretary for HHS, Steven Wagner, also explained that he expected the fear of separation would discourage families from migrating: "We expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[64]

97.     In implementing the Family Separation Policy, the government specifically targeted families for prosecution so that it could generate a pretext for separating them.[65]  Among other

---

[60] Ex. 11, DOJ Jan. 2021 OIG 21-028 Report at 1.

[61] *Id.* at 39.

[62] Ex. 25, Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/ [hereinafter *Here Are the Administration Officials*].

[63] Ex. 26, *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR, May 11, 2018, https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

[64] Ex. 25, *Here Are the Administration Officials*.

[65] Ex. 27, *"Zero Tolerance" at the Border: Rhetoric vs. Reality*, TRAC IMMIGR. (July 24, 2018), https://trac.syr.edu/immigration/reports/520/.

things, Attorney General Sessions specifically directed U.S. Attorneys in jurisdictions along the southwest border to focus prosecution efforts on families that had been apprehended.[66]

98.     Further, a redacted April 23, 2018 DHS Memorandum demonstrates that then Secretary of Homeland Security Kirstjen Nielsen personally signed off on the policy of separating parents and children to deter others from migrating to the United States.  Kevin McAleenan, the Commissioner of U.S. Customs and Border Protection; L. Francis Cissna, the Director of U.S. Citizenship and Immigration Services; and Thomas Homan, Acting Director of ICE, sent a memorandum to Nielsen which laid out three options for increasing illegal entry prosecutions.  The details regarding each of the three options is redacted, but McAleenan, Cissna, and Homan recommended "Option 3," which would "pursue prosecution for all amenable adults who cross our border illegally, including those presenting with a family unit," as "the most effective method to achieve operational objectives and the Administration's goal to end 'catch and release.'"[67]  The memo contains a redacted signature approving Option 3.[68]

99.     In a separate unredacted April 24, 2018 Memorandum to then-Secretary Nielsen, DHS General Counsel John Mitnick further elaborates, as to the third option, that "it would be legally permissible to separate minors from adult family members."[69]  In conceding that the third option has "more pronounced litigation risk associated with such separations," John Mitnick further noted that "our legal position is likely strongest in those cases in which separation occurs in connection with a referral of an adult family member for criminal prosecution."[70]

100.    The scope of the Family Separation Policy extended far beyond the scope of the Zero Tolerance Policy.  Federal agents did not limit separations to families where parents were prosecuted for illegal entry; they also forcibly separated children from parents who were not prosecuted,

---

[66] Ex. 11, DOJ Jan. 2021 OIG 21-028 Report at 24, 34–35.
[67] Ex. 28, *Memorandum for the Secretary*, DEP'T HOMELAND SEC., April 23, 2018, https://www.documentcloud.org/documents/4936568-FOIA-9-23-Family-Separation-Memo.html.
[68] *Id.*
[69] Ex. 29, *Memorandum for the Secretary*, DEP'T HOMELAND SEC., OFF. GEN. COUNS., April 24, 2018, https://www.documentcloud.org/documents/22271324-ice-memos-regarding-family-separation#document/p3.
[70] *Id.*

keeping them separated for months.  In fact, more than fifteen percent of all adults separated from children as part of the Family Separation Policy were not referred for prosecution.[71]

101.    The United States even misled families and separated migrant parents from their children when the families followed the government's express instructions regarding how to enter the country and apply for asylum.  The government directed asylum applicants to enter the United States through official ports of entry to submit their applications, and assured them that, by doing so, they could avoid any risk of separation.  For example, then-Secretary Nielsen stated: "DHS is not separating families legitimately seeking asylum at ports of entry.  If an adult enters at a port of entry and claims asylum, they will not face prosecution for illegal entry.  They have not committed a crime by coming to the port of entry."[72]  Additionally, then-Attorney General Sessions made similar statements, noting that asylum applicants should "come through the border at the port of entry."[73]

102.    Despite these promises and directions, the United States separated at least sixty asylum-seeking families at ports of entry between May and June of 2018.[74]  The children were as young as five months old, and were separated from their families for at least four weeks, and some for more than a year.[75]

103.    Even where parents were prosecuted, the cruelty and duration of the separation remained unexplained by any stated government justification.  For instance, parents whose criminal proceedings lasted only a day would return to custody to find their children missing and remained separated from them for weeks or months, with no information about their children's whereabouts or

---

[71] Ex. 30, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families*, DEP'T HOMELAND SEC., OFF. INSPECTOR GEN., Nov. 25, 2019 (OIG-20-06), at 33, https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf [hereinafter DHS Nov. 2019 OIG-20-06 Report].

[72] Ex. 31, *Press Briefing by Press Secretary Sarah Sanders and DHS Secretary Kirstjen Nielsen*, TRUMP WHITE HOUSE ARCHIVES (June 18, 2018 5:11 PM), https://trumpwhitehouse.archives.gov/briefings-statements/press-briefing-press-secretary-sarah-sanders-department-homeland-security-secretary-kirstjen-nielsen-061818/.

[73] *Sessions Defends Zero Tolerance Immigration Policy*, FOX NEWS (June 18, 2018, 9:14 AM), https://video.foxnews.com/v/5799065216001/#sp=show-clips.

[74] Ex. 32, *CBP Separated More Asylum-Seeking Families at Ports of Entry than Reported and for Reasons Other than Those Outlined in Public Statements*, DEP'T HOMELAND SEC., OFF. INSPECTOR GEN., May 29, 2020 (OIG-20-35), at 2, https://www.oig.dhs.gov/sites/default/files/assets/2020-06/OIG-20-35-May20.pdf.

[75] *Id.* at 8.

wellbeing.[76]  In other instances, government officials purposefully arranged to have parents transferred to different facilities after their prosecutions had ended so that they could not be reunited with their children, reportedly because CBP officials wanted to avoid doing paperwork.[77]

104.    The process of taking children away from their parents was "often chaotic and even more cruel than necessary."[78]  Children were shuffled off without explanation or knowledge of where their parents were, leaving no opportunity for goodbyes.  Officials even went as far as to separate a mother from her infant daughter while she was breastfeeding.[79]  These separations were traumatic for the children.  In a June 2018 audio clip leaked from a detention facility, children are heard desperately sobbing and screaming out for "Mami" and "Papá" while a Border Patrol agent jokes: "[w]ell, we have an orchestra here . . . What's missing is a conductor."[80]

105.    The chaos and cruelty of the Family Separation Policy were further compounded by the federal agencies' callousness and carelessness, wreaking trauma that lasted far after the official end of the Policy.  In an eye-opening report, the Office of the Inspector General found that the DOJ did not effectively plan or coordinate the Policy with other agencies, and that the Department's "single-minded focus on increasing prosecutions came at the expense of careful and appropriate consideration of the impact that . . . family separations would have on children . . . and the government's ability to later reunite the children with their parents."[81]

---

[76]  Ex. 33, *The Trump Administration's Child Separation Policy: Substantiated Allegations of Mistreatment: Hearing Before the H.R. Comm. on Oversight and Reform*, 116th Cong. (July 12, 2019), Serial No. 116-46 at 27–29 (statement of Jennifer Nagda, Policy Director, Young Center for Immigrant Children's Rights), https://docs.house.gov/meetings/GO/GO00/20190712/109772/HHRG-116-GO00-Transcript-20190712-U10.pdf.

[77]  Ex. 34, *Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy*, DEP'T HOMELAND SEC., OFF. INSPECTOR GEN., September 27, 2018 (OIG-18-84), at 15, https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf [hereinafter DHS Sept. 2018 OIG-18-84 Review].

[78]  Ex. 12, Majority Staff Report, *Trump Administration's Family Separation Policy* at 13.

[79]  Ex. 35, Amanda Arnold, *Migrant Mother Says Federal Agents Ripped Away Her Baby While She Was Breastfeeding*, THE CUT (June 13, 2018), https://www.thecut.com/2018/06/immigrant-mom-says-federal-agents-took-baby-as-she-breastfed.html.

[80]  Ex. 36, Ginger Thompson, *Listen to Children Who've Just Been Separated from Their Parents at the Border*, PROPUBLICA (June 18, 2018, 3:51 PM), https://www.propublica.org/article/children-separated-from-parents-border-patrol-cbp-trump-immigration-policy.

[81]  Ex. 11, DOJ Jan. 2021 OIG 21-028 Report at 69.

106.    Strikingly, the OIG found no evidence that HHS was notified that the Zero Tolerance Policy would be implemented.  As a result, HHS was unprepared for the influx of separated children.[82]  New child referrals to HHS surged under the Zero Tolerance Policy.[83]  While federal statute requires the transfer of children from DHS to HHS care within seventy-two hours, insufficient bed capacity delayed such transfers for more than 800 children.[84]  To handle the increased intake volume, ORR opened an emergency influx care facility.  However, that facility was later closed after it was found that significant vulnerabilities at the facility compromised children's health and safety.  Other care provider facilities also struggled to meet the unique mental health needs of separated children, who exhibited more fear, feelings of abandonment, and post-traumatic stress disorder ("PTSD") than the UACs those facilities typically served.

107.    The legacies of this inhumane Policy also extended to those families that were reunited.  The trauma of children and parents being indefinitely separated from each other lasts long after they are reunited.  This legacy is what J.C.O.C. and M.M.O.S. had to endure as they attempt to recover from the trauma of their separation.

4.    _Botched Reunification Efforts Continue to Harm Separated Families After Injunction Ends Policy_

108.    The government intentionally neglected to implement procedures to track families it separated.  Because of this neglect, the government's late-stage efforts to reunite families was chaotic, leading to prolonged or permanent separation.  In the subsequent months and years, hundreds of children separated from their parents under the Family Separation Policy will likely never be reunited with their parents.[85]

---

[82]  However, HHS is not wholly immune from blame.  An OIG report found that senior HHS officials ignored concerns from ORR staff about a significant increase in the number of separated children in late 2017.  Ex. 15, HHS Mar. 2020 OIG OEI-BL-18-00510 Report at 15.
[83]  _Id._ at 20–21.
[84]  _Id._
[85]  _See_ Ex. 37, Joint Status Report at 6–7, _Ms. L v. U.S. Immigr. & Customs Enf't_, No. 18-428 (S.D. Cal. Oct. 20, 2020), ECF Nos. 556, 556-1.

a.   ***Public Outrage and Court Order Force Officials to End the Family Separation Policy***

109.   The Family Separation Policy ran for about three months.  The barbarity of the Family Separation Policy provoked public outrage, including litigation.  Under public and judicial pressure, President Trump revoked the government's Family Separation Policy by Executive Order on June 20, 2018.[86]  His order directed that DHS "shall, to the extent permitted by law and subject to the availability of appropriations, maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members."[87]  In doing so, President Trump reaffirmed that the Policy's goal had been to leverage the harm of separation to deter asylum seekers from seeking refuge in the United States.

110.   After terminating the Policy, President Trump was interviewed by Fox News, where he bemoaned: "Now you don't get separated, and while that sounds nice and all, what happens is you have literally you have 10 times as many families coming up because they're not going to be separated from their children . . . . It's a disaster."[88]  During the interview, President Trump affirmed that the practice of separating families was intended as a "disincentive" for entering the country.[89]  He then reiterated this during a later press conference, stating: "If [asylum applicants] feel there will be separation, they don't come."[90]  Later, President Trump re-affirmed the deterrence strategy: "If a

---

[86]  Ex. 38, Exec. Order No. 13,841, 83 Fed. Reg. 29435 (June 20, 2018), https://www.federalregister.gov/documents/2018/06/25/2018-13696/affording-congress-an-opportunity-to-address-family-separation.

[87]  *Id.*

[88]  Ex. 39, Kimberly Kindy et al., *Trump Says Ending Family Separation Practice Was "Disaster" that Led to Surge in Border Crossings*, WASH. POST, Apr. 28, 2019, https://www.washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5_story.html.

[89]  *Id.*

[90]  Ex. 40, David Shepardson, *Trump Says Family Separations Deter Illegal Immigrations*, REUTERS (Oct. 13, 2018, 5:44 PM) https://www.reuters.com/article/us-usa-immigration-trump/trump-says-Family-Separationsdeter-illegal-immigration-idUSKCN1MO00C.

family hears that they're going to be separated—they love their family—they don't come.  I know it sounds harsh."[91]

111.    But it was not until six days *after* the Executive Order that prosecutions under the Policy ended.  In *Ms. L v. U.S. Immigr. & Customs Enf't*, Judge Sabraw of the Southern District of California denied the Trump Administration's motion to dismiss the plaintiff class's challenge to the Policy, holding:

> [Plaintiffs'] allegations sufficiently describe government conduct that arbitrarily tears at the sacred bond between parent and child, and is emblematic of the exercise of power without any reasonable justification in the service of an otherwise legitimate governmental objective.  Such conduct, if true, as it is assumed to be on the present motion, is brutal, offensive, and fails to comport with traditional notions of fair play and decency.  At a minimum, the facts alleged are sufficient to show the government conduct at issue "shocks the conscience" and violates Plaintiffs' constitutional right to family integrity.[92]

112.    Judge Sabraw certified the *Ms. L.* class and preliminarily enjoined the Family Separation Policy.[93]  Holding that "the record in this case reflects that the separations at issue have been agonizing for the parents who have endured them," Judge Sabraw held that the plaintiffs were likely to succeed on the merits because the Policy violated their longstanding constitutional right to family integrity.[94]  Judge Sabraw then ordered the government to reunify the families who had been separated because of government conduct.[95]

### b.    *Reunification Is Chaotic Due to Officials' Intentional Failure to Plan*

113.    Despite the pushback, reunification would be a chaotic and traumatic process for separated families because of the government's intentional lack of planning.  Judge Sabraw was pointed in his criticism of the government's failure to track separated families, finding in his *Ms. L.*

---

[91]  Ex. 41, Eric Cortellessa, *Trump Declines to Rule Out Reviving Family Separations During CNN Town Hall*, TIME (May 10, 2023, 10:16 PM) https://time.com/6278925/trump-family-separation-border-cnn-town-hall/.

[92]  *Ms. L v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1167 (S.D. Cal. 2018) (internal quotation marks, citations, and alterations omitted).

[93]   *Ms. L v. U.S. Immigr. & Customs Enf't*, 331 F.R.D. 529, 531 (S.D. Cal. 2018) (class certified); *Ms. L v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1149–50 (S.D. Cal. 2018) (preliminary injunction).

[94]  *Ms. L.*, 310 F. Supp. 3d at 1146–47.

[95]  *Id.* at 1149.

preliminary injunction decision that the "unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*."[96] Indeed, the government implemented no formal systems to track separated families until months after issuing the Executive Order terminating the Policy.[97]

114.    The government could not readily comply with the *Ms. L.* injunction since there was no system in place to reunite families.  During the three months when the Policy was in effect, the United States forcibly separated at least 5,648 children from their parents.[98]  Since the goal of the Policy had been to separate families, the government neglected to systematically track family members for reunification.  The government's neglect continued through the Family Separation Policy, even after the Pilot Program revealed that the consequences of failing to maintain such systems included prolonged separation.

115.    Prolonged—even permanent—separation was part of the Policy's intentional design. Officials refused to take steps that would facilitate reunification after separation.  Based on their experience with the Pilot Program, DOJ officials knew that the relevant government agencies' failure to record and track separations made it impossible to identify and reunify families.[99] Officials had been directly notified of these deficiencies before implementing the Family Separation Policy.  For example, agency officials warned that it would not be possible to track and identify separated families even within Border Patrol's system—let alone between different agencies.[100] Despite this, other "key stakeholders" urged the government to implement the Policy before these identified deficiencies had been resolved.[101]

116.    Because there was no reunification plan, officials undertook various ad hoc methods to record and track family separations while the Policy was in effect.[102]  Predictably, these ad hoc methods led to widespread errors, for which government officials subsequently expressed

---

[96]  *Ms. L.*, 310 F. Supp. 3d at 1144 (emphasis in original).
[97]  *See* Ex. 34, DHS Sept. 2018 OIG-18-84 Review at 9–12.
[98]  Ex. 42, Declaration of Marc Rosenblum at 2, Joint Status Report, *Ms. L*, No. 18-428 (S.D. Cal. Sept. 22, 2021), ECF No. 616.
[99]  Ex. 30, DHS Nov. 2019 OIG-20-06 Report at Highlights.
[100]  *Id.* at 8–11.
[101]  *Id.* at 18–19.
[102]  *Id.* at Highlights.

"embarrassment."[103]  HHS and DHS did not systematically track information about where the separated children and parents were held.  A DHS-OIG report found that "DHS lacked information technology (IT) to reliably track separated families . . . leading to 'widespread errors' in DHS data about the families."[104]  While navigating these ad hoc methods, an ORR staff member reported, "[s]ometimes it's easier to find a parent in a rural village in Guatemala than to find them in detention."[105]

117.    As a result of this poor planning and coordination, the reunification process inflicted further harm on separated families.  This inability to locate parents further "haunted" separated children who already "experienced heightened feelings of anxiety and loss as a result of their unexpected separation from their parents after their arrival in the United States" and needlessly prolonged detention in care facilities.[106]  Facilities reported that children experienced long wait times at or near detention centers before being reunited with their parents.[107]  These children would wait between eight hours to multiple days in vans or last-minute hotel rooms.  Sometimes, children were transported to reunification sites, only to heartbrokenly realize that the parent was not there.  The lack of time to prepare children for reunification and the long waits led to significant stress for children already traumatized by separation.

118.    Officials were also aware that the reunification process was harming families.  In the wake of the reunification chaos, ORR Associate Deputy Director Tricia Swartz emailed HHS officials: "This is becoming more and more outrageous.  Another DHS $#!* show, and ORR is left holding the bag, while kids are harmed."[108]  The intentional failure to establish a systematic process for reuniting separated families compounded the harm that parents and children had weathered.  But, to the government, this chaos of reunification was an intentional aspect of the Policy.

---

[103]  Ex. 30, DHS Nov. 2019 OIG-20-06 Report at 12.
[104]  Ex. 15, HHS Mar. 2020 OIG OEI-BL-18-00510 Report at 22.
[105]  *Id.* at 25.
[106]  *Id.* at 22.
[107]  *Id.* at 31.
[108]  Ex. 17, *A.P.F.* Revised Opposition to Defendant's MSJ at 9.

C.      GOVERNMENT OFFICIALS VIOLATED THE CONSTITUTION AND MULTIPLE MANDATORY LEGAL OBLIGATIONS BY SEPARATING PLAINTIFFS AND DETAINING THEM IN ABHORRENT CONDITIONS

119.      A 2019 federal class preliminary injunction found that the trauma that families suffered due to their separation was so severe that the government violated their Fifth Amendment Due Process rights.[109]  Independent expert reporting also reveals the long-term and severe harm that the federal government's Family Separation Policy has wreaked on affected parents and children. Children manifest both psychological and somatic effects of the trauma, such as difficulty sleeping, severe anxiety, aggression, loss of language, heightened responses to perceived threats, and excessive fear of separation.[110]  After separation, parents have also been diagnosed with PTSD, major depressive disorder, and generalized anxiety disorder.[111]

120.      Further, the government had no discretion to separate Plaintiffs and detain them in such inhumane conditions.[112]  No law or regulation required the government to separate the Plaintiffs.  Nor did the government have any reason for concern that J.C.O.C. posed any risk to M.M.O.S., or that Plaintiffs posed any safety or security concern whatsoever—let alone a concern requiring separation.  Indeed, the separations and continued mistreatment that federal agents inflicted on Plaintiffs violated the United States Constitution, mandatory federal policy, and federal law.

1.      *GOVERNMENT OFFICIALS VIOLATED THE CONSTITUTION THROUGH FORCED FAMILY SEPARATIONS*

121.      The government violated the Constitution when it imposed and subjected Plaintiffs to the Family Separation Policy.  First, it violated their constitutional right to family integrity by forcibly separating them.  The United States Supreme Court has long-held that the parent-child relationship is protected under the Constitution, and that it is essential for children to remain with

---

[109] *Ms. J.P. v. Sessions*, No. CV18-06081, 2019 WL 6723686, at *39–*41 (C.D. Cal. Nov. 5, 2019).
[110] *See* Ex. 7, PHR, *You Will Never See Your Child Again* at 20–24.
[111] *See id.*; Ex. 43, Johayra Bouza et al., *The Science Is Clear: Separation Families Has Long-Term Damaging Psychological and Health Consequences for Children, Families, and Communities*, SOC'Y RES. CHILD DEV. (June 10, 2018), https://www.srcd.org/briefs-fact-sheets/the-science-is-clear.
[112] *See Ms. L.*, 302 F. Supp. 3d at 1165 (finding that separated plaintiff families, including those in DHS custody after conviction of a misdemeanor border-crossing offense, were "victims of a wide-spread government practice" instituted for "no legitimate reason").

their parents.[113]  This relationship is constitutionally protected for citizens and non-citizens alike, irrespective of whether they are confined by the government.[114]  Indeed, the court in *Ms. L* held that the Policy violated non-citizens' same constitutional rights.[115]

122.    Second, the Constitution mandates that the government meet the basic human needs for sleep, food, water, sanitation, medical care, and reasonable safety of anyone in custody.[116]  These standards apply to the Border Patrol's *hieleras*, and other locations where Plaintiffs were detained.[117]  The conditions of confinement to which Border Patrol subjected the Plaintiff in the *hielera* and other locations where he was detained, described in detail above, violated these longstanding constitutional standards.

123.    Third, separations under the Zero Tolerance Policy were motivated by discriminatory animus against Latino migrants of Central American origin in violation of Fifth Amendment equal protection.  The constitutional right to equal protection, and freedom from discrimination on the basis of race or national origin has long been recognized as "extend[ing] to anyone, citizen or stranger, who is subject to the laws of a State," even those not lawfully present.[118]  Rather than direct prosecution of all 8 U.S.C. § 1325(a) offenses, including at the northern border, the April 2018 "Zero Tolerance" memorandum only "direct[ed] each United States Attorney's Office *along the*

---

[113] *See Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923) (holding that the parent-child relationship is constitutionally protected).

[114] *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 500 (D.D.C. 2018).

[115] *Ms. L.*, 310 F. Supp. 3d at 1145–46 ("A practice of this sort implemented in this way is likely to be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,' . . . interferes with rights 'implicit in the concept of ordered liberty[,]' . . . and is so 'brutal and offensive that it [does] not comport with traditional ideas of fair play and decency.'" (internal quotation marks omitted and cleaned up)).

[116] *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Thomas v. Baca*, 514 F. Supp. 2d 1201, 1216 (C.D. Cal. 2007) (in more restrictive criminal custody context, "requiring inmates to sleep on the floor deprives them of a minimum measure of civilized treatment and access to life's necessities because access to a bed is an integral part of the 'adequate shelter' mandated by the Eighth Amendment").

[117] *Doe v. Kelly*, 878 F.3d 710, 725 (9th Cir. 2017) (upholding preliminary injunction requiring improvements to conditions in *hieleras* in Arizona); *Unknown Parties v. Nielsen*, 2020 WL 813774, at *19–*22 (D. Ariz. Feb. 19, 2020) (entering permanent injunction requiring improvements in certain Arizona *hieleras* on constitutional grounds).

[118] *Plyer v. Doe*, 457 U.S. 202, 215 (1982) (emphasis removed).

*Southwest Border*" to increase border-crossing charges.[119]  Central American asylum seekers like Plaintiffs were targeted for deprivation of their right to family integrity to deter them from pursuing legitimate immigration claims.

        2.    *GOVERNMENT OFFICIALS DEPARTED FROM MANDATORY AGENCY REGULATIONS IN CARRYING OUT THE ZERO TOLERANCE POLICY*

124.    By separating Plaintiffs, CBP also violated a set of mandatory policies set forth in the U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search ("TEDS") which "govern[s] CBP's interaction with detained individuals."[120]  Notably, TEDS requires "CBP [to] maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation."[121]  This was not done.

125.    In addition to preserving family unity, CBP agents had a duty to "consider the best interest of the juvenile at all decision points beginning at the first encounter and continuing through processing, detention, transfer, or repatriation."[122]  Given the well-documented damage caused by family separation, CBP agents violated this duty by separating J.C.O.C. and M.M.O.S.

126.    Under TEDS, "[a]ll instructions and relevant information must be communicated to the detainee in language or manner the detainee can comprehend."[123]  On information and belief, communications with Plaintiffs were not conducted as such.  This is clearly in violation of that mandatory policy.

127.    TEDS Section 4.3 further states that "[u]pon a detainee's entry into any CBP hold room, officers/agents must ask detainees about, and visually inspect for any sign of injury, illness, or physical or mental health concerns and question detainee about any prescription medications.  Observed or reported injuries or illnesses should be communicated to a supervisor, documented in

---

[119]  Ex. 24, OAG Apr. 2018 Zero Tolerance Memorandum.
[120]  Ex. 44, *National Standards on Transport, Escort, Detention, and Search*, CUSTOMS & BORDER PROT., Oct. 2015, at 3, https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf [hereinafter TEDS Standards].
[121]  *Id.* at 4.
[122]  *Id.*
[123]  *Id.*

the appropriate electronic system(s) of record, and appropriate medical care should be provided or sought in a timely manner."[124]  Rather than following the mandatory medical care requirements established in TEDS, CBP agents took away J.C.O.C.'s medication and left him to anguish for weeks before restarting him on his prescription.

128.    In subjecting M.M.O.S. to inhumane and unsafe conditions in CBP custody, where government agents held her in unsanitary cells and deprived her of adequate food, clean drinking water, adequate bedding, and sufficient space to sleep, the government violated federal law and policy requiring that minors be held in "facilities that are safe and sanitary," and that account for "the particular vulnerability of minors."[125]

3.    *GOVERNMENT OFFICIALS VIOLATED FEDERAL LAW IN CARRYING OUT THE ZERO TOLERANCE POLICY*

129.    Government officials violated federal statutes throughout Plaintiffs' detention.  First, the government officials violated longstanding, codified asylum law.  Federal law guarantees any non-citizens on U.S. soil or at ports of entry the right to seek asylum and related humanitarian protections, regardless of how, where, or with whom they crossed into the country or arrive at the U.S. border.[126]  The asylum statute, codified in the Refugee Act of 1980, reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores," and "gives statutory meaning to our national commitment to human rights and humanitarian concerns."[127]

130.    Second, immigration officials also violated the law by using TVPRA provisions as a sword against M.M.O.S. to separate her from her father, instead of as a shield as Congress intended. The TVPRA, which was meant to protect children who arrive in the United States without a parent, defines an "unaccompanied alien child" as a child who is under eighteen, lacks lawful immigration

---

[124]  Ex. 44, TEDS Standards at 14.
[125]  Ex. 45, Stipulated Settlement Agreement at ¶ 12.A, *Flores v. Reno*, No. 85-4544 (C.D. Cal. Jan. 17, 1997); *Flores v. Barr*, 934 F.3d 910, 915–916 (9th Cir. 2019); *see also* Ex. 46, *U.S. Border Patrol Policy: Hold Rooms and Short Term Custody*, CUSTOMS & BORDER PROT., Jan. 31, 2008, https://www.cbp.gov/sites/default/files/assets/documents/2022-Jan/Hold%20Rooms%20and%20Short%20Term%20Custody%202008_1.pdf.
[126]  *See* 8 U.S.C. § 1158(a)(1) (asylum); 8 U.S.C. § 1231(b)(3) (withholding of removal); 8 C.F.R. § 208.1 (protection under the Convention Against Torture).
[127]  S. REP. NO. 96-256, at 1 (1979) 96th Cong., 1st Sess. 1 (1979), *reprinted in* 1980 U.S.C.C.A.N. 141, 141, 1979 WL 10382 (Leg. Hist.).

status, and for whom "there is no parent or legal guardian in the United States; or no parent or legal guardian in the United States is available to provide care and physical custody."[128]  Instead of using this provision to ensure that M.M.O.S. was placed into the custody of a parent or other family relative, immigration officials exploited this provision to seize long-term custody of M.M.O.S. *from her parent*.  After designating M.M.O.S. as a UAC and separating her from her father, they sent her off to ORR, even though the government knew exactly where her father was in the United States.

*       *       *

131.    The government had no discretion to implement the Family Separation Policy, as it violated the United States Constitution, court orders, federal law, and agency standards in doing so.

## COUNT 1—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

132.    The other paragraphs of this Complaint are incorporated as if fully set forth herein.

133.    By engaging in the acts described in this Complaint, the government officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

134.    As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

135.    Under the FTCA, Defendant is liable to Plaintiffs for intentional infliction of emotional distress.

## COUNT 2—NEGLIGENCE

136.    The other paragraphs of this Complaint are incorporated as if fully set forth herein.

137.    The federal officials referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

138.    By engaging in the acts alleged herein, the federal officials referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.  For example, Defendant breached its duty of care by separating Plaintiffs, by failing to properly track M.M.O.S.'s

---

[128]  6 U.S.C. § 279(g)(2).

whereabouts, by failing to allow Plaintiffs to communicate with each other, and by treating Plaintiffs inhumanely.

139.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

140.    Under the FTCA, Defendant is liable to Plaintiffs for negligence.

### COUNT 3—MEDICAL NEGLIGENCE AS TO PLAINTIFF J.C.O.C.

141.    The other paragraphs of this Complaint are incorporated as if fully set forth herein.

142.    The federal officials referenced above had a duty to Plaintiff J.C.O.C. to provide appropriate medical care.

143.    By engaging in the acts alleged herein, the federal officials referenced above failed to act with ordinary care and breached their duty of care owed to J.C.O.C.  For example, Defendant breached its duty of care by taking away Plaintiff J.C.O.C.'s anti-anxiety medication, and by withholding and refusing to provide Plaintiff J.C.O.C. with anti-anxiety medicine.

144.    As a direct and proximate result of the referenced conduct, J.C.O.C. suffered substantial damages.

145.    Under the FTCA, Defendant is liable to J.C.O.C. for medical negligence.

### COUNT 4—ABUSE OF PROCESS

146.    The other paragraphs of this Complaint are incorporated as if fully set forth herein.

147.    Defendant's employees, officials, agents, and/or contractors improperly used legal processes within their control for the unlawful ulterior purposes.  And such purposes were neither warranted nor authorized.

148.    Defendant's employees, officials, and/or agents had the ulterior purposes of traumatizing Plaintiffs and deterring future migrants from seeking refuge in the United States.

149.    As a result of Defendant's improper use of legal processes within their control, Plaintiffs were substantially damaged.

150.    Under the FTCA, Defendant is liable to Plaintiffs for abuse of process.

## COUNT 5—BREACH OF FIDUCIARY DUTY TO PLAINTIFF M.M.O.S.

151.    The other paragraphs of this Complaint are incorporated as if fully set forth herein.

152.    Defendant's employees, officials, and agents were guardians of M.M.O.S.

153.    In turn, M.M.O.S. was a ward of the federal employees, officials, and agents.

154.    As guardians, Defendant's employees, officials, and agents had a fiduciary relationship to M.M.O.S., as a child housed in federal facilities.

155.    Among their obligations as guardians, Defendant's employees, officials, and agents were obligated to act in the best interest of M.M.O.S.

156.    As described more fully throughout this Complaint, however, these federal employees, officials, and agents breached these fiduciary duties to M.M.O.S.

157.    As a direct and proximate result of those breaches, M.M.O.S. suffered severe emotional distress.

158.    Under the FTCA, Defendant is liable to M.M.O.S. for breach of fiduciary duty.

## COUNT 6—LOSS OF CONSORTIUM

159.    The other paragraphs of this Complaint are incorporated as if fully set forth herein.

160.    Plaintiffs had a legal right to parent-child consortium, which the Defendant's employees, officials, and agents violated.

161.    The substantial mental and physical injuries suffered by Plaintiffs continue to frustrate their ability to interact and communicate as a family.

162.    Under the FTCA, Defendant is liable to Plaintiffs for their loss of consortium.

## COUNT 7—INTENTIONAL INTERFERENCE WITH CUSTODIAL RELATIONS

163.    The other paragraphs of this Complaint are incorporated as if fully set forth herein.

164.    Knowing that J.C.O.C. did not consent, Defendant's employees, officials, and agents abducted and compelled M.M.O.S., who was (and remains) a minor, to leave the care and custody of J.C.O.C., who were legally entitled to custody.  Defendant intended to deprive J.C.O.C. of custody over M.M.O.S., without J.C.O.C.'s consent, for the express purpose of causing Plaintiffs harm.

165.    As a direct and proximate result of the government's conduct, Plaintiffs suffered severe emotional trauma and substantial damages.

166.    Under the FTCA, Defendant is liable to Plaintiffs for intentional interference with custodial relations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request:

a)  Compensatory damages;

b)  Punitive damages;

c)  Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

d)  Such other and further relief as the Court deems just and appropriate.


Dated: October 16, 2023                        Respectfully submitted,

                                               */s/  Akshay S. Deoras*
                                               Akshay S. Deoras (SBN 301962)
                                               Yan-Xin Li (SBN 332329)
                                               Jenny Quang (SBN 345742)
                                               KIRKLAND & ELLIS LLP
                                               555 California Street, 27th Floor
                                               San Francisco, CA 94104
                                               T: (415) 439-1400
                                               F: (415) 439-1500
                                               akshay.deoras@kirkland.com
                                               yanxin.li@kirkland.com
                                               jenny.quang@kirkland.com

                                               Victoria Petty (SBN 338689)
                                               Jordan Wells (SBN 326491)
                                               LAWYERS' COMMITTEE FOR CIVIL RIGHTS
                                                   OF THE SAN FRANCISCO BAY AREA
                                               131 Steuart Street, Suite 400
                                               San Francisco, CA 94105
                                               T: (415) 543-9444
                                               F: (415) 543-0296
                                               vpetty@lccrsf.org
                                               jwells@lccrsf.org

                                               *Attorneys for Plaintiffs J.C.O.C. and M.M.O.S.*